As a preliminary matter, this case is related to the Hoyt partnership cases, of which this Court is very, very familiar. This Court has heard many cases concerning the Hoyt cases, including another Hoyt innocent spouse case. And I apologize, I don't have the formal site. I do have the docket number and date it was issued. It's a non-published opinion, Bartek v. Commissioner. Docket number 04-73235, and it was issued on December 12, 2004. This case is a case where Mrs. Capehart, a widow, is requesting innocent spouse relief due to the adjustments that are due to her husband's investment in the Hoyt partnerships. She has requested relief on three grounds, actually, 6015-B, 6015-C, and 6015-F. 6015-B is very close to the traditional innocent spouse relief that was found in 6013-E, which the minor changes, or major changes, one being there no longer is a requirement of a grossly erroneous items. Let me make sure I understand here, that we're all on the same page. This is, these are taxes that are being collected, the Commissioner seeks to collect, for income earned in past years. Yes. I mean, stop me if whenever I say something that is wrong, but that's good. That was earned on very normal means, I don't, you know, salary, investment, income, you know, not related to this particular investment, and that the taxes were not paid at the time because this was thought to be sheltered by a tax shelter. That's correct. Okay. So, what your client is seeking is the benefit of a tax shelter that turned out not to be a tax shelter. Actually, no, Your Honor. I believe it's in the briefs, but the KAPARTS paid approximately, my numbers might be slightly off, $89,000 over to Hoyt, and only received approximately $39,000 in tax relief. So, this isn't getting the benefit of a tax shelter. No, no, I understand. So, they had $89,000, they lost it to a swindler. Absolutely. Okay, nothing we can do about that. I don't even remember the KAPARTS losses anymore for that kind of thing, but whatever it is, that's out of the picture here. And then, by paying the money to a swindler, they thought, I'm sure honestly, and I'm sure Mrs. KAPARTS honestly believed, that they were buying themselves a tax shelter. They were investing in something that was a tax shelter. But it turns out it wasn't a tax shelter. I should stop you. Mr. KAPARTS honestly believed that. Mrs. KAPARTS, this is a classic innocent spouse case. It's not very classic. It's really rather unclassic. But anyway, go ahead. You know, I apologize then. To me, it appears classic in the fact that Mrs. KAPARTS did not want to invest. And she did everything she could. But if she hadn't invested, she wouldn't have gotten the tax shelter anyway. She would have had to pay income taxes on that income. I think this is a classic. The only way that she is, I'm not at all denigrating her loss, which I'm sure, is that she also lost money to a swindler. Well, the problem with that, Your Honor, is that would be true in absolutely every case where the innocent spouse signed a joint return. And there is an issue of attributable to. So even though you can't get innocent spouse relief if you don't sign a joint return, so it is important, it is an important distinction on whether or not it was Mr. Hoyt's investment, Mr. Hoyt, Mr. KAPARTS' investment, or Mrs. KAPARTS' investment. And the reason why I was saying this might be... The problem is that the classic innocent spouse, the classic... That's what I was just going to point to. ...is the poor little old housewife who's puttering around in the kitchen and with the kids, doesn't know anything about her husband's games, doesn't know what he's up to. He may even be hiding it from her, as in Pietro Monaco. He's hiding all this stuff. She doesn't have a clue. It's pretty hard from this record, it strikes me, to say that Mrs. KAPARTS was any more clueless than her husband. Well, what is classic is the fact that there was extraordinarily controlling behavior and abuse. Mental abuse, even though there wasn't physical abuse. And I would assert there was violence... You argue that, but the record doesn't demonstrate that. The record demonstrates something, but it also demonstrates that he's so controlling and so powerful that when she says, I'm going out to work, and he says, I don't want that to happen, she does it as she feels like it, and she does it. Actually, not true, Your Honor. Excuse me? Not true. She didn't go out to work? If I may explain. The first time she went out to work, he was in Vietnam and wasn't there to say, you can't do it. And when he came back, if she hadn't been working, they wouldn't have been able to make the mortgage payment. And so, you know, once a done deal, she seems to have been able to get out to work again. But he made some very serious restrictions on her hours, you have to be home by a certain time because I have to have dinner on the table, you can only work these days, etc., etc. So he stepped back on the restriction of you cannot ever work, but he continued throughout their marriage with the restrictions on the hours she could work. What do we do with the task force finding? We've listened to all this evidence, we've heard her evidence, we've heard what's going on, we've seen the record, and as we see it, she's not being abused by her husband in such a way that she had to do this whether she liked it or not. She was more sophisticated financially than he was, probably. And she wasn't forced into this, that's what they held. Well, when you say she's more sophisticated financially, she thought she was good with numbers, she indeed wrote the checks, all of the household checks, as in the case you mentioned, Petronat Monaco, and also the Guth case, these are all Ninth Circuit cases cited in our brief, and the Price case. And in fact, in none of those cases is there any comment, I'd have to go back and look to see if there's absolutely any comment, I'll let her think about it, is there any discussion about there being the level of controlling behavior that we have here? And Mr. Capehart was indeed overreaching. That job that she made the money on, and she was sticking the money that she could away in a nest egg to buy furniture, because they hadn't had new furniture, he took it and bought a boat. Absolutely not what she wanted to spend that money on. Didn't ask her first, bought the boat. If every wife whose husband bought a boat she didn't want, well, there are a lot of wives there who wouldn't pay any income taxes at all. I mean, it's just what happens, sometimes the husband controls the money, and he buys himself a toy, and sometimes the wife controls the money. I would agree. It's hard to sort of second-guess these family relationships. I would agree with you. For better or for worse, we had a problem. This was part of a pattern. Mrs. Capehart had never been able to make the financial decisions in the family. She might have been more financially astute, and that's difficult to know. I know that even though there was some mention that she was a bookkeeper even early on in 1970, she was making approximately $2 an hour, so very unsophisticated. But it was part of a pattern. She didn't get to pick the house. She didn't get a choice on where her nest egg went. She didn't get to pick the cars. He'd go away and come home, and there'd be the car. She didn't get, if the boat was standing alone, it would not have a meaning. But it's part of the pattern, and it's even this little nest egg of the one thing you would think that she would maybe have some control over is this little money that she put aside for a very specific purpose, and she didn't even have control over that. Now, on this investment, the record seems to indicate that he didn't just say, you've got to take it, and it's tough luck, you do what I say. He took her to the meetings. He argued with her. She said, I want to take it to a lawyer. Fine, she takes it to a lawyer. She takes something to a lawyer, not very much, but something to a lawyer, some sort of thing. But he said, fine, take it to the lawyer. The lawyer says, what I saw looks okay. She comes back and tells him. He said, you see, it's a good deal. Everything, not everything, but a lot in this record indicates that he's spending a lot of time trying to convince her that it's really a good deal. One thing of an abusive, controlling person is saying, listen, listen, wife, you do what I say, and that's the end of that. I don't see that in this record about this investment. I would actually disagree with that. I believe she spent a lot of time trying to convince him not to invest in this investment, not to continue in this investment. And, by the way, after that initial partnership agreement was signed, he entered into another partnership without even talking to her about it. That's very different from the classic scenario that Judge Flanders was talking about, where the wife doesn't know anything. Once a year, the husband comes to her in the kitchen and says, here, sign here. And she signs. I mean, at this point, she not only has some involvement in the thing, she talks with her husband, she opposes the law, but when the time comes, she signs the return. But that wouldn't be true. It's not just a question of her participation at the time on the investment. She puts her name on the tax return and signs on to it. She didn't know she had any alternative. This is a German-born citizen. And, by the way, in 2004, when the tax court found she was fluent in English, Believe it or not, some of us who have come to this country and do figure out how you pay taxes, it's possible. It can be done. It can be done, Your Honor. I don't think it's any less possible for a woman than for a man. You know, it depends a lot. No, I mean, seriously. It depends a little bit on the circumstances. There are some people who come to this country, you know, my father and mother never fully learned English, but they hired a tax guy to do their taxes. But it's still a test, Your Honor. Look at this individual's background, look at her level of education. Her level of education, pardon me, was slightly less than yours, Your Honor. And believe me, it was not slightly less than my parents. And if I may, when we're talking about a classic innocent spouse case, I would refer you again to the Guth case and the Price case in the Ninth Circuit because in both of those cases, the innocent spouse knew about the investment. And, in fact, there's no indication that the innocent spouse in those cases  definitely complied with her duty to inquire. We have a catch-22 here. What did she need to do to comply with this duty to inquire and not have, you know, step over the line and be participating in? And I submit that everything that Mrs. Capehart did was in regards to her duty to inquire. Of course, she didn't know about the test. She was just simply trying to convince her husband not to continue this investment. In her gut, it felt wrong to her. It sounds like you're re-arguing your position on the facts to us. But are we not reviewing a trial court's decision yet? Yes, you are. Yes, you are, Your Honor. And to address that, we do believe that there are errors in the trial court's decision in the context of facts that the trial court ignored. For example, there were questions asked by the commissioner's counsel. You know, was he a violent man? No. Did he threaten you? No. Were you afraid of him? And the answer was yes, but that doesn't show up. And then she proceeded to discuss how he hit the walls and threw things. And that falls under my definition of violence. And it's very possible that Mrs. Capehart thought, because she'd been asked over and over and over again, was he violent towards you? She answered that he wasn't violent toward her, but he threw things and hit the wall. Is it your view that a trial court has to mention every piece of evidence in order to make findings of fact? I couldn't hear everything, Your Honor. Excuse me? I couldn't hear everything. Is it your view that a trial court must mention every piece of evidence when it makes a finding of fact? No, Your Honor. But I believe these pieces are relevant to this particular case. I believe the trial court... Of course they're relevant. Is it your view... Material. Is it your view that a trial court must mention every piece of relevant evidence when it decides the case? I believe that the trial court should mention all material pieces. And I believe that that particular piece was material. As opposed... And also, I believe the trial court erred in determining that the individual could read or understand these materials. If I may make one or two comments about 6015C, because that is different. There is... The question there... There's been no dispute that Mrs. Capert qualifies under that provision, which is for widowed and separated individuals. And the dispute is whether... About the allocation. And if Your Honors do not believe that the classic 6015B applies, then the classic 6015D allocation should apply. Because if, as that section states, allocation as if they filed separate returns, I don't think anybody can read this record and determine that without Mr. Capert's input, that Mrs. Capert would have put the Hoyt partnership, anything, on her separate returns. Thank you. May it please the Court. Is that good, Your Honor? May it please the Court. I'm Anthony Sheehan. I represent the Commissioner of Internal Revenue in this appeal. How are you, Mr. Sheehan? Anything you've heard this morning leads you to believe that your case wasn't adequately covered in your briefs? Anything you need to add? No, Your Honor. Thank you. I mean, there are things I could say, but I think the briefs have to be covered. The case that's argued will stand submitted.
judges: Kozinski, Fernandez, Carney